UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
STEVEN TROY,                                                :        03 Civ. 9975 (CSH)
                                                            :
                        Plaintiff,                          :
                                                            :
        -against-                                           :        MEMORANDUM, OPINION AND
                                                            :        ORDER
                                                            :
UNUM LIFE INSURANCE COMPANY                                 :
OF AMERICA,                                                 :
                                                            :
                        Defendant.                          :
------------------------------------------------------------ x

HAIGHT, Senior District Judge:

This is an action governed by the Employee Retirement and Income Security Act, 29

U.S.C. §1001 *et seq.* ("ERISA"). Plaintiff Steven Troy brings suit against defendant Unum Life

Insurance Company of America for unpaid disability benefits allegedly due plaintiff under an

employee-sponsored long-term disability plan (the "Plan"). Defendant moves for "Judgment on

the Administrative Record." Plaintiff opposes this motion and cross-moves for summary

judgment pursuant to Rule 56, Fed. R. Civ. P.

## I. BACKGROUND

Plaintiff Troy worked as Chairman and Chief Executive Officer of Ketchum Directory

Advertising, as President of Ketchum Interactive Group, both divisions of Ketchum

Communications, Inc. ("Ketchum"), and as a member of the Board of Directors of Ketchum.

Complaint ¶ 8. Ketchum was an advertising and public relations conglomerate with

approximately $1.8 billion in annual sales. *Id.* The two Ketchum divisions headed by plaintiff

consisted of 160 employees in seven offices and earned revenue of $125 million. Plaintiff's

1

Memorandum in Support of his Motion for Summary Judgment, at 1.

Plaintiff tested positive for Human Immunodeficiency Virus ("HIV") in 1984.
Administrative Record ("AR") 293. Plaintiff had been employed at Ketchum since 1976 and
continued to work at Ketchum until April 1994. AR 44, 47-48. Medical records from mid-1993
through April 2004 report significant symptoms, including fevers, night sweats, diarrhea, fatigue,
flu, herpes, sore throat, molluscum, warts, oral thrush, short term memory loss, and
anxiety/depression. AR 22-34. Troy's treating physician noted in his records in 1993-1994 that
Troy "cancelled 10 d[ay] business trip," "messed up presentation due to [increased] memory loss
(forgot parts of presentation); reported "problems at work...;" "has trouble [with] memory, but
even simple calculations in head are 'impossible';" "has to redo calculations repeatedly;" was
"fatigued every day now goes home after w[or]k [and] collapses." AR 28-31. On April 5, 1994,
plaintiff began treatment with the antiretroviral medication AZT. AR 22. On that date, plaintiff's
weight was reported by his treating physician at 160 lbs., a decline of 26 lbs. from August 9,
1993. *Id.* Plaintiff ceased work at Ketchum on April 8, 1994. AR 52.

Troy subsequently initiated a disability claim with Unum under the long term disability
plan ("the Plan") sponsored by Ketchum. AR 47-52. While Unum is nominally an insurance
company, "[i]f an insurance company controls the distribution of funds and decides whether or
not to grant benefits under an employee benefit plan, then it can be sued as a plan administrator."
*Sheehan v. Metropolitan Life Ins. Co.*, 2002 WL 1424592 (S.D.N.Y. June 28, 2002) at *2. Unum
was the administrator of the Ketchum Plan.

The Plan defines disability for "Officers who are members of the Board of Directors," as:

> "Disability" and "disabled" mean that because of injury or
> sickness: 1. you cannot perform each of the material duties of your
> regular occupation; or 2. you, while unable to perform all of the

> material duties of your regular occupation on a full-time basis, are:
> a. performing at least one of the material duties of your regular
> occupation or another occupation on a part-time or full-time basis;
> and b. earning currently at least 20% less per month than your
> indexed pre-disability earnings due to that same sickness or injury.

Troy's treating physician diagnosed him with symptomatic HIV disease, and secondary conditions of depression, epigastritis, and wasting. AR 50. Unum advised plaintiff on June 24, 1994 that his claim for disability benefits had been approved. AR 65-66.

In June 1999, Unum wrote to plaintiff requesting "updated certification of your continued disability." AR 133. The letter requested a supplemental statement form to be filled out by plaintiff's treating physician at that time, Dr. Donald Northfelt, board certified in internal medicine and medical oncology. AR 133, 239. Northfelt completed an Attending Physician's Statement reporting that plaintiff suffered in the prior 12 months from symptoms of "fatigue, decreased mental concentration, depression" and that he was restricted from engaging in activities that are "stressful, high irritability, mentally challenging, demanding." AR 193.

On September 22, 2000, Northfelt completed another Attending Physician statement stating that: "P[atient] should *not* work in any mentally or physically demanding job-related activity...P[atient] cannot be exposed to any situations that could fatigue or cause more damage to his immune system." AR 220. In or about December 2000, Unum began to investigate plaintiff's continued entitlement to benefits. According to defendant, the investigation was undertaken "due to the stability of plaintiff's condition and greater level of activity." Defendant's Memorandum of Law in Support of Defendant's Motion for Judgment on the Administrative Record, at 4. Defendant had plaintiff's claim reviewed by a registered nurse. The registered nurse observed plaintiff was "clinically stable" but found "psyche issues likely." AR 226. She advised

3

that Unum "may need to obtain [psychiatrist's] notes to clarify ongoing impairment." *Id.*

Dr. William Hall, a specialist in infectious disease, then reviewed the claim as Unum's on-site physician. AR 228. As part of this review, Hall telephoned Northfelt to ask "what is absolute, objective impediment to attempt to return to [full time] light activities including work?" AR 227. Hall summarized the content of this telephone call in the record, determining that Northfelt "acknowledges absence of objective physical impediment to attempt to return to [full time] light activities and work and agrees that measured observations of virologic and immunologic responses to ART have been excellent." AR 230. Northfelt was sent a letter detailing the telephone conversation and was asked to countersign the letter if he believed Hall had fully and accurately paraphrased the conversation. AR 237. In response, Northfelt sent his own letter, detailing Troy's consistent reports of fatigue, diarrhea and other gastrointestinal problems, and weight loss. Northfelt provided, as an example, Troy's considerable weight decline between September 1998, when he weighed 179 lbs, and November 13, 2000, when he weighed 164 lbs. Northfelt wrote, "I strongly suspect that these problems are related, at least in part, to his HIV disease or to his antiretroviral therapy. I base this conclusion on my experience in caring for persons with HIV over the past 15 years, as well as on my current practice experience with over 300 HIV-infected patients. I believe that these symptoms and problems would make it very difficult for Mr. Troy to maintain the level of function required for him to carry out the duties of his previous employment." AR 239. Whereas Hall characterized plaintiff's records as demonstrating an "absence of objective physical impediment," Northfelt described Troy's "symptom inventory" including objectifiable symptoms. Northfelt separately addressed Troy's psychological ailments: "Other aspects of his medical condition, including emotional stress, anxiety, memory problems, and depression are more difficult to objectify...In my

4

experience, these are very common complaints reported by persons with HIV disease receiving antiretroviral therapy, and can also be disabling." AR 239. Northfelt suggested that the aspects of plaintiff's condition that were more difficult to objectify "could probably be documented with neuropsychiatric testing." *Id.*

In August 2001, defendant received an anonymous email message and an anonymous telephone call claiming that plaintiff had defrauded defendant by submitting a false diagnosis of wasting syndrome and opportunistic infection. AR 241. Defendant's Special Investigations Unit concluded in February 2002 that there was insufficient information to make a fraud referral. AR 517.

On August 21, 2001, defendant requested updated certification of plaintiff's continued disability, including a supplemental statement completed by plaintiff and his attending physician. AR 284. Defendant forwarded the file, including this updated information, to a registered nurse on December 6, 2001. AR 473-474. As before, the review noted that plaintiff's viral load and CD4 counts were stable. *Id.* The nurse referred the file to Hall again for comment on functional capacity. *Id.* On December 20, 2001. Hall concluded that his review of available medical records did "not identify indicators of severe, progressive or intractable organ-specific or constitutional disease or symptoms evaluable as medically impairing." AR 477.

Defendant referred plaintiff's record for a vocational analysis on January 17, 2002, by way of a "Walk in Discussion." (AR 482-485). The vocational consultant determined that plaintiff's occupation was "Manager, Advertising: Any Industry," and concluded that this occupation is classified by the Department of Labor's Dictionary of Occupational Titles as a sedentary occupation, "with respect to strength requirements, requiring lifting up to ten pounds occasionally and negligible amounts frequently." *Id.*

5

Defendant also conducted surveillance of plaintiff's activities from November 26 through November 28, 2001, which observed a man "standing, walking, climbing steps, leaning, bending over at the waist, carrying trash bags and snapping right arm in an up and down motion while shaking a piece of cloth." AR 452-472, 498. Defendant now admits the surveillance video did not depict plaintiff, but rather, his domestic partner. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, at 16.

Defendant advised plaintiff on January 31, 2002 that he was no longer eligible for benefits. AR 497-499. The letter informed plaintiff of the anonymous fraud tips that had prompted an investigation into his eligibility for benefits. *Id.* The Special Investigation Unit was not yet finished at that time with its investigation into the anonymous tips. *Id.* Defendant's letter also described its medical review of the claim, stating that "we concluded based on all the objective medical documentation in your claim file, that there is no indication of severe, progressive or intractable disease or symptoms which would preclude you from performing your occupation as a Chairman, Director of Advertising." *Id.* Defendant also informed plaintiff that it referred the claim file to a vocational consultant who concluded that plaintiff's occupation was "Sedentary Work, with lifting up to ten pounds occasionally, and frequently reaching, handling, talking, hearing, and near acuity." *Id.* Defendant included the results of its video surveillance, explaining to plaintiff that he appeared in the video to have "a muscular build," and detailing the activities that plaintiff had been observed undertaking. *Id.* The letter concluded that: "Based upon our review of the medical, surveillance and vocational information in the file, we have determined that you no longer meet the above definition of disability. Your claim for Long Term Disability Benefits is terminated effective January 31, 2002." *Id.* The definition of disability

6

included in the letter was not the disability applicable to plaintiff under his policy.[1] *Id.*

In response to the termination letter, plaintiff's attorney contacted defendant in hopes of avoiding a full appeal of the termination decision. Plaintiff's counsel explained that "[t]he termination of [Troy's] benefits (letters dated 1/31/02 and 2/5/02) reflected reliance on a single, 'any reasonable occupation' definition." AR 531. Plaintiff's counsel further explained plaintiff's understanding that, as a member of Ketchum's board of directors, a different definition of disability applied to him. Defendant agreed to reconsider its termination of plaintiff's benefits, which was to be completed within 60 days. AR 533. Defendant's vocational rehabilitation coordinator, Wendell Wallace, commissioned a labor market survey as part of this review. The firm conducting the labor market survey concluded, after over six weeks, that it was "unable to obtain pertinent information for this report." AR 586-599. Upon further review of the file, defendant notified plaintiff on May 15, 2002, that it would continue to pay benefits to plaintiff under a reservation of rights, while it continued to review his file. AR 605-607. Defendant requested the names of all treating physicians, and particularly of psychologists and neuropsychiatric physicians. *Id.* After receiving medical records from all treating physicians, including Dr. Linda Lang, plaintiff's psychiatrist, defendant forwarded plaintiff's file to a second registered nurse for review of plaintiff's functional capacity. AR 803-805. The registered nurse concluded on August 1, 2002 that "It is not clear to this Reviewer if/how significantly functional capacity is impacted." AR 803. She recommended that a physician and "psyche" specialist review the file. *Id.*

---

[1] The definition of disability included in Unum's letter to plaintiff was the one for "All Other Employees," not Officers who are members of the Board of Directors. This definition provides that: "'Disability' and 'disabled' mean that because of injury or sickness: 1. you cannot perform each of the material duties of your regular occupation; and 2. after benefits have been paid for 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably fitted by training, education or experience."

7

Michelle Schwab, a licensed clinical psychologist, reviewed the file on August 2, 2002, for evidence of "psychiatric impairment of such severity as to preclude work capacity in [Troy's] own occupation." AR 806-807. Schwab specified that she was conducting "a review of documents in the claim file. I have not examined the insured." AR 807. Schwab found "no data indicative of a severe mood disorder that would explain total incapacity to work." *Id.* Furthermore, she concluded: "There are no data available that would indicate insured was markedly impaired by Major Depression such that he would be rendered incapable of working prior to the date this claim was closed." *Id.* Schwab indicated that the degree of plaintiff's impairment was "not well defined," and that the claims of cognitive impairment were not validated by neuropsychological testing. She concluded, "the insured appears to be a man who has had some depressive symptoms for quite a while but has claimed inability to work based on physical incapacity related to HIV. I find no compelling clinical evidence that the insured has been unable to work since date of loss due to a severe psychiatric condition." AR 806.

On August 8, 2002, Hall again conducted the medical review of the record. He found, as before, no "absolute or objective impediments" to plaintiff's attempt to return to "full time light activities and work." AR 808. On August 16, 2002 Wallace completed a vocational analysis based upon a "Full File Review," and absent his previously-ordered labor market survey, determined that plaintiff's occupation as chairman, chief executive officer, member of the board of directors, or member of the executive committee were all described by the Dictionary of Occupational Titles as "sedentary." AR 812. Wallace concluded, however, that the extensive travel required by these positions made it "appropriate to state that his job was in fact light exertional in nature." *Id.* Wallace provided no further analysis, methodology, or reasons for his determination. *Id.*

8

By letter dated August 23, 2002, defendant informed Troy of its determination that he was no longer eligible for long term disability benefits. AR 824-827. The letter stated that "we have concluded that you are capable of performing full-time light work capacity in your own occupation." AR 825. Defendant's letter explained that light exertional capacity is defined as "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for sedentary work. Light work usually requires walking or standing to a significant degree. However, if the use of arm and/or leg control requires exertion of forces greater than that for sedentary work and the worker sits most of the time, the job is rated for light work." *Id.*

Plaintiff's counsel requested a formal appeal of defendant's determination by letter dated November 20, 2002. AR 917-927. Plaintiff's counsel submitted along with this appeal request, a neuropsychological evaluation by a licensed psychologist, Carlos Prieto, a vocational evaluation and report by Vocational Economics Inc. ("Vocational Economics"), and additional psychiatric treatment records covering treatment from 1998-1999 (not previously submitted). AR 837-927.

Defendant's quality appeal specialist recommended that a medical doctor and a psychiatrist review the file to consider the plaintiff's disability. AR 930. Hall was once again utilized as the medical reviewer, and concluded, "I am not able to assign adequacy, consistency, or credibility to this individuals [sic] complaints or statements of fatigue and of significant or progressive weight loss for the period 5/94 to 5/02." AR 934.

The record was then reviewed by a licensed psychologist, Steven N. Van De Mark, who emphasized the Prieto neuropsychological evaluation in particular. AR 943-945. Prieto had concluded that "Mr. Troy's complaints of a decreased ability to concentrate, a decreased ability

9

to simultaneously perform multiple complex tasks, to maintain information in his short-term memory, and to sustain a high level of energy through the course of a day were all supported by the findings from this evaluation." AR 908. Van De Mark considered the Prieto evaluation to consist of an "abbreviated" set of tests "not adequate for forensic/disability purposes." AR 945. Van De Mark concurred with Schwab's earlier psychological review, that it did appear from the file that Troy's primary mental status symptoms began to emerge after denial of his disability claim. AR 944. Van De Mark concluded, "there does not appear to be supportive evidence for work impairment of a psychological/psychiatric nature." AR 943. Van De Mark then requested and obtained the raw test data from Prieto. Van De Mark again concluded that there was a lack of evidence to support work impairment, writing "after rereading Dr. Prieto's report and reviewing the actual data, I do not find support for organically related neurocognitive impairment for Mr. Troy." AR 961.

Finally, defendant concluded its appeal process by sending the record for another vocational review by vocational rehabilitation consultant, Richard Byard. AR 947-950. Byard was asked to review the occupational information in the file in order to determine what the classification of Troy's occupation of Chairman, CEO should be, keeping in mind that he was also a member of the Board of Directors. Byard was also asked to review Vocational Economics' independent vocational assessment to assess whether the opinions rendered there regarding the cognitive requirements of the insured's occupation were supported by the record. Byard concluded that the Vocational Economics assessment concentrated on the combination of plaintiff's varied roles as Chairman, President, and member of the Board of Directors. In Byard's opinion, "not all Private Sector Executives/Presidents serve on or chair their respective corporate boards," and therefore it was not necessary to plaintiff's occupation that he perform the entire

10

combination of responsibilities that he had performed for Ketchum." AR 948. Byard accepted Unum's prior determination that there were "significant business travel demands" in plaintiff's occupation. Based on these factors, and without further analysis or research, Byard determined that "it is reasonable to classify the claimant's occupations as that of a Corporate President and to acknowledge that the occupation is generally performed at a *light* level of physical exertion." AR 947. Further, Byard determined that "it is reasonable to note that the occupation typically demands above average levels of Reasoning, Math and Language ability, and that the work involves complex problem solving skills, technical expertise and the ability to direct, control and plan the activities of others." *Id.* He did not believe it within the scope of his analysis, however, to assess the cognitive restrictions and limitations upon the plaintiff. *Id.*

Defendant informed Troy on April 7, 2003 of its determination that the earlier decision to deny addition benefits was appropriate. AR 974-975. This letter summarized at length the findings of Hall, Van De Mark, and Byard recounted above. *Id.* It explained that the investigation into plaintiff's ongoing eligibility for benefits was initiated by the two anonymous tips, and it cited "a reported activity level that...appear[s] inconsistent with an individual so impaired that he is unable to work." AR 969. In particular, it listed "extensive traveling" between California and New Jersey, participation in the Gay Men's Chorus, a vacation to Mexico, swimming, and bicycling. *Id.* The letter stated that "the inconsistencies between Mr. Troy's actual and reported activity level raises questions regarding the credibility of your client's reports." *Id.*

On April 23, 2003, Troy's counsel sent defendant a letter explaining plaintiff's intention to file a summons and complaint in the event that defendant did not decide to reverse its claim denial. AR 1059-1069. Counsel submitted along with its letter further medical records, as well as tax records demonstrating plaintiff's increased medical costs. AR 1020-1058. Defendant

11

confirmed receipt of the April 23, 2003 letter and informed plaintiff's counsel that it would consider the new information, as well as arrange for an independent neuropsychiatric evaluation. AR 1077. Plaintiff's counsel expressed plaintiff's willingness to undergo examination by an independent neuropsychologist, as well as his "concern...for how UNUMProvident's independent neuropsychiatric evaluation will be conducted." AR 1080. An independent evaluation was scheduled with Robert Sica, a licensed psychologist, for October 6, 2003. AR 1184. On October 1, 2003, however, defendant received a telephone call from Sica who informed defendant that he did not wish to conduct the independent medical examination. AR 1185. Defendant informed plaintiff and scheduled an appointment with another independent psychologist. AR 1189. This appointment was cancelled due to plaintiff's decision not to undergo a neuropsychological examination arranged by defendant. Plaintiff's counsel informed defendant of this decision by letter dated October 20, 2003, explaining that he contacted Sica who "quite forthrightly told me that he withdrew because he had become convinced that the process would not be fair to Mr. Troy and that UNUMProvident bad put him in the untenable position of using his professional skills in the service of a preordained conclusion." AR 1200-1201. Defendant accordingly proceeded with its review of the benefits denial on the basis of the new materials submitted by plaintiff, but without an independent neuropsychological examination. Medical records relating to physical impairment were again reviewed by Hall; psychological records were again reviewed by Van De Mark. AR 1208-1212. Both Hall and Van De Mark found no new evidence to change their prior conclusions and confirmed their opinion that impairment was not sufficient to preclude a return to work. AR 1210, 1212. Defendant informed plaintiff of its decision to reaffirm its previous denial of benefits in a substantial letter dated November 17, 2003. AR 1264-1269. Plaintiff filed suit on December 16, 2003 claiming improper denial of disability benefits.

12

Scherzer Summary Judgment Decl., Ex. A.

## II. DISCUSSION

*Standard of Review of ERISA Administrator's Denial of Benefits*

The standard of review of an ERISA administrator's determination depends on whether the benefit plan explicitly confers discretion on the administrator. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999); *DeFelice v. American International Life Assurance Company*, 112 F.3d 61 (2d Cir. 1997). Both parties agree that, on the record at bar, there does not appear to be an explicit grant of discretion. Plaintiff's Opposition to Defendant's Motion for Judgment on the Administrative Record, at 4; Defendant's Motion for Judgment on the Administrative Record, at 17. As the Second Circuit reiterated in *Locher v. Unum Life Insurance Company of America*, 389 F.3d 288 (2d Cir. 2004), where an ERISA plan administrator does not have discretionary authority over deciding eligibility or construing the terms of the plan, a district court reviews "all aspects of an administrator's eligibility determination, *including fact issues, de novo.*" (citing *Firestone Tire & Rubber Co. V. Bruch*, 489 U.S. 101, 115, 109 S.Ct 948, 103 L.Ed.2d 80 (1989)) (emphasis added) 389 F.3d at 293.

Defendant nonetheless states that "there will be disagreement as to the standard of review the court should apply to the administrator's factual determination here, the highly deferential arbitrary and capricious standard or *de novo* standard." Defendant's Motion for Judgment on the Administrative Record, at 18. Defendant argues that the Second Circuit "has not spoken definitively" on the question of whether the *de novo* standard applies to factual determinations as well as issues of plan interpretation. *Id.* at 17. Defendant contends that the Second Circuit in *Locher* was not briefed on the question and "noted that the parties had not disputed the application of the *de novo* standard in that case." Defendant seems to be arguing that therefore

13

the *Locher* decision did not meaningfully address the question of whether the *de novo* standard applies to factual determinations, despite its explicit statement that a district court reviews "all aspects" of the determination, "including fact issues, *de novo.*"

There is no substance to the defendant's argument. Defendant points to no decision that would indicate any ambiguity on the part of the Second Circuit with regard to this point of law. Furthermore, the *Locher* decision was not the first time the Second Circuit addressed the question. In *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999), the Second Circuit reviewed the holdings of other circuits on this issue and held that "the *de novo* standard of review applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator." 181 F.3d at 245, 249-51. The *Kinstler* holding was again restated by the Second Circuit in *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003), and once again in *Locher*. Defendant relies in its Rely Memorandum on *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed. 2d 1034 (2003), in which the Supreme Court held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." In *Nord*, the Supreme Court did not speak to the district court's *de novo* standard; in fact, the plan at issue in *Nord* made an explicit grant of "sole and absolute discretion" to the plan administrator. *Nord* preserved for the plan administrator the ability to freely weigh the facts before it, without district courts placing upon administrators *ex ante* presumptions in favor of certain facts over others. Such a holding does not limit the district court from reevaluating the facts *de novo* in appropriate cases, where the plan does not provide an explicit grant of discretion to the administrator. A district court continues to possess the authority to weigh competing physician opinions itself, and to make findings of fact based on its own consideration of the evidence. The *Nord* holding averts a *per se*

14

presumption in favor of the opinions of treating physicians; it does not re-write the district court's standard of review of ERISA administrators' factual determinations.

The parties are in agreement that the Plan provides no explicit grant of discretion to the administrator. Accordingly, I follow the binding authority of the Second Circuit in applying a *de novo* standard of review to all aspects of defendant's denial of benefits.

## Motion for Judgment on the Administrative Record

Defendant moves for "judgment on the administrative record," stating in a footnote that "[t]he Second Circuit recognized in *Muller v. First Unum Life*, 341 F.3d 119, 124 (2d. Cir. 2003), that a motion for judgment on the administrative record is 'essentially a bench trial on the papers; and is an appropriate way to review an ERISA claim administrator's decision." Defendant's Motion for Judgment on the Administrative Record, at 1. This misconstrues the *Muller* opinion. *Muller* first explains that a motion for judgment on the administrative record "does not appear to be authorized by the Federal Rules of Civil Procedure," and that such motions are often treated as motions for summary judgment under Rule 56, Fed. R. Civ. Proc. Then, only after explaining that the district court had *"already denied* summary judgment" on the same issue that was again before it for judgment on the administrative record, and that no further discovery had taken place since that denial of summary judgment, did the *Muller* court find that the district court's decision could be understood as "essentially a bench trial on the papers with the District Court acting as the finder of fact." *Muller* 341 F.3d at 124 (internal citations omitted). In the case at bar, neither party has previously moved for summary judgment. Accordingly, the parties' motions will be considered cross-motions for summary judgment under Rule 56, Fed. R. Civ. Proc.

15

*Evidence Outside the Administrative Record*

Troy proffers additional evidence external to the administrative record, which he submits the Court should exercise its discretion to consider. Specifically, plaintiff proffers the deposition of Sica, taken October 20, 2004 (the "Sica Deposition"), and what he calls the "Regulatory Settlement Agreement between Defendant and the Attorneys General of most of the States of the Union and the United States Department of Labor" (the "Regulatory Settlement"), announced by defendant's parent corporation on November 18, 2004. Plaintiff contends that these documents "evidence defendant's failure to fairly administer Mr. Troy's claim, pursuant to business practices it adopted which served its financial interest in denying claims." Scherzer Summary Judgment Decl., ¶ 3.

It is within the discretion of the district court to admit additional evidence, where good cause exists. *Locher*, 389 F.3d at 294 (*quoting DeFelice*, 112 F.3d 61 (2d Cir. 1997)). "[U]pon *de novo* review, even purely factual interpretation cases may provide a district court with good cause to exercise its discretion to admit evidence not available at the administrative level...In this situation, the district court may assume an active role in order to ensure a comprehensive and impartial review of the case." 112 F.3d at 66. In *DeFelice*, a demonstrated conflict of interest in the administrative reviewing body, due to the same entity acting as both claims reviewer and claims payor, was found to be an example of "good cause" warranting the consideration of additional evidence. *Id.* at 67. However, "[a] conflicted administrator does not *per se* constitute good cause." *Locher*, 389 F.3d at 296. The *DeFelice* holding was based "not only on a demonstrated conflict of interest, but also upon the procedural problems with the plan administrator's appeals process," including the fact that the appeals committee that reviewed DeFeclice's claim was comprised entirely of employees of the administrator, that there existed no

16

established criteria for determining an appeal, and that the appeals committee appeared to routinely destroy or discard all records within minutes of hearing an appeal. *Id.* at 293-295. "Where sufficient procedures for initial or appellate review of a claim are lacking, there exist greater opportunities for conflicts of interest to be exacerbated and, in such a case, the fairness of the ERISA appeals process cannot be established using only the record before the administrator." *Id.* At 296.

I find a significant number of facts call into question the sufficiency and fairness of defendant's claims review process. On each review of plaintiff's benefits determination, the medical review was conducted by the same Unum on-site physician, Hall. On appeal, Hall alone reviewed his prior determinations and confirmed them. Although defendant's vocational analysis was reviewed by a new vocational assessment expert on each appeal, the defendant's analyses at every level provided scant explanation, never more than a few paragraphs. By comparison, the Vocational Economics assessment, solicited by plaintiff and submitted to defendant on appeal, was eleven type-written pages, based in part on an interview with plaintiff, and included a further 36 pages of research from O*NET, the Department of Labor's new occupational information system, intended to replace the Dictionary of Occupational Titles that was consistently relied upon by defendant's analysts. AR 859-895. At each stage of the appeal, Unum's vocational analysts selected an occupational title out of the Dictionary of Occupational Titles without any explanation as to how or why this was done. Of course, Unum's vocational specialists may have good reason for their selections, as well as for their continued use of the Dictionary of Occupational Titles, but it appears to the Court that these determinations warrant at least some explanation. Given that the occupational description is one of two material elements to the definition of disability under the Plan, such vocational analysis seems glaringly insufficient.

17

Moreover, that this appears to be defendant's standard procedure for determining such a central element of its *own* definition of disability raises serious concerns. Plaintiff's external vocational consultant appears to have utilized more sophisticated, extensive, and up-to-date analysis and than the Plan administrator. Defendants' vocational reviewers were silent as to the merits of their choice of reference, the Dictionary of Occupational Titles, even after reviewing the Vocational Economics report, which utilized O*NET extensively and explained that O*NET was intended to replace the Dictionary.

Adding more questions as to Unum's review process is the analysis of defendant's medical reviewer. Hall does not appear to be aware of the definition of disability under the Plan when he makes his determination that plaintiff is capable of returning to "light activity and work." Hall opines that plaintiff is capable of returning to "work", without any reference to the type of work plaintiff formerly did, and without exhibiting any understanding of the Plan's definition of disability, which defines plaintiff as disabled unless he is capable of returning to his regular occupation (or, if he works in part-time in his own occupation or works in another occupation, he is disabled unless he earns over 80% of his indexed pre-disability earnings). Indeed, defendant's own letter dated January 31, 2002, conveying the original denial of plaintiff's benefits, cites the *wrong definition* of disability, calling into question whether it even applied the appropriate definition in reaching its initial determination to deny plaintiff's disability benefits.

Finally, a significant complicating factor of the determination before the plan administrator is that plaintiff's alleged disability is contributed to by anxiety arising out of his physical condition. Defendant made its determination with respect to both physical and mental aspects of plaintiff's condition on the basis of opinions of independent consultants who never personally examined plaintiff, while discounting the opinions of plaintiff's treating physicians

18

and independent examiners who *did* conduct personal examinations. As discussed above, administrators are free to credit their own reliable evidence over the opinions of treating physicians. *Black & Decker v. Nord*, 538 U.S. at 834. First-hand observation is especially important, however, in the context of psychological evaluation. Defendant's crediting of psychological evaluations based solely on the medical record and not upon personal examination is an additional factor calling into question the insufficiency and unfairness of the review process in Troy's case.[2]

---

[2] In an earlier ERISA case dealing with an insurance company's termination of disability benefits for a plaintiff whose disabling condition was complicated by mental depression, I had occasion to say: "Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time." *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005) (collecting cases). I went on to observe:

> Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms: in Sheehan's case, as described by Dr. Prati, depression, fear of death, and anxiety, among others. Physicians do not diagnose or evaluate these different conditions in the same way. It matters not if a patient with ischemia, ventricular scarring, or atrial fibrillation is depressed or elated; an echocardiogram or stress test will reveal his condition. It matters not if a patient with arthritic spinal degeneration or scoliosis fears death or believes himself immortal; an x-ray or MRI will reveal his condition. But surely Dr. Prati was right in testifying that when a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," Tr. 145, a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes. That medical reality explains the holdings of the cases I have cited. In the case at bar, the procedure MetLife employed in determining Sheehan's psychiatric condition was limited to obtaining an opinion from a psychiatrist who never examined him. Given the foregoing considerations, I conclude that MetLife's procedure was sufficiently flawed to give the Court good cause to consider evidence outside the administrative record.

*Id.* at 255 (footnotes omitted).

19

Taken together, the foregoing provides sufficient good cause under the Second Circuit's standard, recently clarified in *Locher*, to introduce additional evidence. Plaintiff's proffer of the Sica deposition is relevant to the Court's evaluation of defendant's determination and to the credibility of competing factual claims.

Plaintiff also moves to allow evidence of the Regulatory Settlement. The Regulatory Settlement does not bear upon the facts of the disposition of plaintiff's particular claim, and I decline to consider it. In response to plaintiff's proffer, defendant has submitted exhibits, containing mostly newspaper articles about plaintiff found via the internet, that it claims support its denial of Troy's claim. I decline to admit new information developed after the denial of benefits, since the claim administrator did not rely upon this information in determining plaintiff's claim.

*Cross-Motions for Summary Judgment*

A court shall grant a motion for summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317 (1986). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, a court must resolve all

20

ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If there is "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party," then summary judgment should be denied. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Summary judgment should only be granted if no rational fact-finder could find in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir. 1994).

Both parties move for summary judgment as to whether plaintiff met his burden of proof that he has a "disability" as defined by the Plan. That is, has plaintiff met his burden of proving that he, because of injury or sickness, is unable to perform each of the material duties of his regular occupation, or is performing material duties of another occupation and earning at least 20% less per month than his pre-disability earnings? The record contains opinions of several doctors: plaintiff's treating physicians on the one hand, and defendant's on site physicians on the other, with conflicting conclusions as to whether plaintiff's illness precludes him from performing the material duties of his regular occupation. Specifically, defendant's medical reviewer, on site physician Hall, repeatedly concluded that there were no "absolute or objective impediments" to plaintiff's attempt to return to "full time light activities and work." AR 227-230, 477, 808. In contrast, plaintiff's treating HIV specialist consistently reported his opinion that "P[atient] should *not* work in any mentally or physically demanding job-related activity." AR 220, 239. Furthermore, defendant's psychological reviewers, Schwab and Van De Mark, reported their expert opinion that plaintiff's file provided "no data indicative of a severe mood disorder that would explain total incapacity to work," and "there does not appear to be supportive evidence for work impairment of a psychological/psychiatric nature." AR 807, 943. The

neuropsychological evaluation conducted by Prieto and submitted by plaintiff concluded that:

> The intense and demanding nature of Mr. Troy's previous job
> would make it impossible for him to perform his duties in any
> comparable way to his pre-morbid level of functioning...Mr. Troy's
> performance throughout this evaluation clearly indicates that he is
> unable to return to any type of gainful employment. Also,
> considering the fact that his decline appears to have occurred
> steadily over the past few years, there is every reason to believe
> that further decline is inevitable. AR 907.

The medical and neuropsychological findings as to the limitations and restrictions required by

plaintiff's disability are disputed in the record, and are unquestionably facts material to the

resolution of this case.

Furthermore, there is a factual dispute as to the material duties of plaintiff's "regular

occupation." Defendant's vocational assessments initially classified plaintiff's occupation as

"sedentary," and upon subsequent review, as "light exertional." AR 482-485, 812, 947. In

contrast, plaintiff's vocational analysis determined that plaintiff's occupation was best described

by the title "Private Sector Executives" and concluded "[b]ased upon the information reviewed

and the interview, it is our opinion that Steven Troy meets the definition of being disabled as

stated in his policy. " AR 896.

The material duties of plaintiff's regular occupation and the restriction and limitations required

by plaintiff's illness are the two elements central to the definition of disability under the Plan.

Both elements are questions of fact that cannot be resolved without the Court's making a

credibility determination as to the expert opinions present in the record. Such a credibility

determination cannot be made on a motion for summary judgment, absent any indication that

some of the expert evidence is unreliable as a matter of law. The differing opinions of the several

doctors, as well as of the vocational consultants, present a genuine issue as to the material facts

of Troy's medical condition and his regular occupation. Accordingly, I deny both cross-motions

22

for summary judgment.

### III. CONCLUSION

For the foregoing reasons, both defendant's motion for summary judgment and plaintiff's motion for summary judgment are denied. The docket sheets reflect that all pre-trial discovery has been completed and the case is ready for trial.

The trial will commence on Monday, October 16, 2006 at 9:30 a.m. in Room 17C, 500 Pearl Street. Counsel must regard themselves as engaged before this Court on that date and until the trial is completed.

A separate Final Pre-Trial Order will be entered in the case and mailed to counsel.

The foregoing is SO ORDERED.

Dated: New York, New York

March 31, 2006

_Charles S. Haight Jr._

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE